UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

B110
#8
Fee paid

| | |
|---|---|
| ANGEL LAUZARA,<br><br>*Plaintiff*<br><br>vs.<br><br>DIRECTORATE OF WHISTLEBLOWER PROTECTION PROGRAMS (OSHA); STEVEN GROMAN; JACK RUDZKI,<br><br>*Defendants* | Case No. 3:21-cv-179<br><br>Honorable: _____<br><br>PRO SE<br><br>**FILED**<br><br>OCT - 8 2021<br><br>~~CLERK U.S. DISTRICT COURT~~<br>WEST DIST OF PENNSYLVANIA |

**COMPLAINT**

1. COMES NOW Plaintiff ANGEL LAUZARA, with this complaint against the Defendants OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION; STEVEN GROMAN; and JACK RUDZKI, as follows:

**PARTIES**

2. Complainant, ANGEL LAUZARA, is an individual of address 114 Venango Street, Johnstown, PA 15905.

3. Defendant DIRECTORATE OF WHISTLEBLOWER PROTECTION PROGRAMS (OSHA), of address Stabler Corporate Center, 3477 Corporate Parkway, Suite 120, Center Valley, PA 18034 is a regulatory agency of the United States Department of Labor.

4. Defendant, STEVEN GROMAN is an individual working in the DIRECTORATE OF WHISTLEBLOWER PROTECTION PROGRAMS (OSHA) office

which address is listed in paragraph 3. Defendant, upon Plaintiff's knowledge, information, and belief, is/was an inspector at the OSHA Directorate of Whistleblower Protection Programs.

5. Defendant JACK RUDZKI is an individual working in the Directorate of Whistleblower Protection Programs - OSHA office which address is listed in paragraph 3. Defendant, upon Plaintiff's knowledge, information, and belief, is/was the supervisor of Defendant Steven Groman.

## JURISDICITON AND VENUE

6. This court has federal question jurisdiction pursuant to 28 U.S.C § 1331 since it involves the violations of federal law.

7. Venue is proper in this district under 28 U.S.C. § 1391 as Plaintiff and/or Defendant is subject to personal jurisdiction in this state. Plaintiff and/or Defendants live, operate, and carry out business within the jurisdiction of this Court. Besides, a substantial part of the acts and omissions forming the basis of these claims occurred in this District and arose from the actions or inactions of the Defendants.

## FACTS

8. Plaintiff was an employee of Siemens Gamesa Renewable Energy, Inc. ("SGRE"). He was hired by the company under its previous name, Gamesa Wind US, on January 3rd, 2011. After working in every assignment that the company required, Plaintiff was assigned as Site Manager at the Sandy Ridge's Windfarm, in Tyrone, PA, on January 12th, 2019. Plaintiff was at that position when he was terminated.

9. During his time in the company, Plaintiff had an excellent record and reputation at all levels in the organization and was a valued service provider for the customer that SGRE had assigned for Plaintiff. Nothing in Plaintiff's character, performance, or actions, would justify the thought of anything abnormal or suspicious under the eyes of any rational person.

10. During the last months in the company, Plaintiff had found several health and safety issues that affected not only the site that Plaintiff had assigned, but all the other sites in the USA; and, in one of the most important issues, related to the safety of the wind turbine elevators that SGRE's technicians use in a daily basis, the scope will apply to ANY wind turbine owner that has that elevator model installed.

11. All the issues found were communicated in real time by Plaintiff to his supervisor, Mr. Michael Christman, as well as the necessary stakeholders in SGRE's chain of command. Due to the inaction on acting on those issues, the communication chain for them lasted many weeks. However, Plaintiff never stopped trying to get them resolved, working on them until his last day in the company.

12. This insistence was the reason of continuous argument between Plaintiff and Mr. Christman, who showed uncomfortable with the attention that this was creating. When a concern was reported by Plaintiff, Mr. Christman was dismissive and unwilling to help Plaintiff to get the answers to the issues.

13. On or about February 24th, 2020, during a routine visit to the site by SGRE's Regional Safety Coordinator for the East Coast, Mr. Michael Sherman, he engaged in a conversation with the employees that Plaintiff had under his assignment about the work permit that SGRE's technicians must fill in every SGRE's site.

14. During the conversation, the technicians explained Mr. Shearman the issues that the document had, which impede it from being practically useful; and, on their own volition, they stated that they were not filling all the fields properly due to these issues. They also expressed what Mr. Shearman already knew, and so told the technicians: that the partial filling of the document was not only happening at their site, but all the others.

15. When this was found by Mr. Christman, his reaction was to write Plaintiff and the technicians up; and, in the case of Plaintiff, adding false accusations of actions that Plaintiff

supposedly had committed one year before, in 2019. Plaintiff and the techs were put under a Performance Improvement Plan (PIP) that lasted two months, and Plaintiff and the team passed without further issues.

16. On March 9th, 2020, Mr. Christman visited Sandy Ridge. Him and Plaintiff engaged in an argument, when Plaintiff asked him why the site was targeted that way, when the technicians were reported that voluntarily to make the process better; and, why he was not supporting Plaintiff on his quest for answers on the H&S matters. Mr. Christman told Plaintiff that "you are pissing off a lot of people in the organization" (sic). He also told Plaintiff that "I don't pay you to read the NFPA 70E" (electrical standards in the workplace).

17. At this point, Plaintiff immediately stopped the conversation and told Mr. Christman that Plaintiff will not speak more to him unless both speak with Human Resources first. Plaintiff called Mrs. Maura Pickett, the Human Resources liaison for the area, but got no answer, leaving a voicemail. Mrs. Pickett never returned the call.

18. On March 24th, 2020, Mr. Christman visited Sandy Ridge again, and a new argument arose: this time started because Mr. Christman had modified the written-up documents for the technicians that he had required the Plaintiff to send to him for review prior to give it to them, adding misconceptions and false statements.

19. Again, this visit, Mr. Christman repeated Plaintiff the comment about NFPA 70E. Again, Plaintiff stopped conversation, and this time told Mr. Christman that there will be no more conversations between them until they both have a meeting with HR. This time, Plaintiff sent an email to Mrs. Pickett reporting the incidents.

20. On March 25th, 2020, Plaintiff received an invitation from Mrs. Pickett for a phone conference between him, Mr. Christman and Mrs. Pickett. The invitation came with a strange title for a meeting about Mr. Christman's behavior: "Catch up".

21. During the conference, Mrs. Pickett did not recriminate Mr. Christman for his words at any time. Instead, she explained that we both were senior managers (forgetting that, while this was true, we were not *equal* senior managers) and that she had confidence that Mr. Christman and Plaintiff will have that resolved. Plaintiff left the conference with the certainty that Human Resources will not provide any help; and that Mr. Christman had no reason to change his behavior.

22. On June 11th, 2020, Plaintiff was able to have a meeting with the SGRE's Directors, Mr. Michael Petersen and Mr. Enrique Ventura; Mr. Christman; Mr. Geoffrey Schmidt, head of Health and Safety for SGRE's service department, and Mr. Shivakumar Puranikmath, head of Engineering for the service department as well, and others.

23. In that meeting, Plaintiff presented a list of the seven H&S issues he had been investigating. All of them would have resulted in additional cost for the company to get them fixed, in some cases (as the elevator issue) in a severe amount of capital. The average time for those issues waiting for resolution was 407 (four hundred and seven) days.

24. Conversely, on June 11th, 2020, Plaintiff was able to have a meeting with Mr. Jorge Salazar, SGRE's Compliance Officer for USA, and Fernando Ferraz de Campos, from the Compliance department on SGRE's headquarters in Spain, about the financial irregularities that I had seen in several departments of the company. Namely, Procurement, Purchasing, Training, and the Warehouse departments.

25. After the meeting of June 12th, 2020, on or around 5:15 PM, Plaintiff had an accident when driving the company truck, that he was allowed to use in a 24/7 fashion. Police was called and determined at the location that the Plaintiff was not at fault, and the other driver's actions will be written in the police report as the cause of the accident.

26. Once this was communicated by the police, Plaintiff called SGRE and reported the accident. Plaintiff also asked his supervisor if he was required to perform a drug test, since

he was cleared of fault by the police. Plaintiff's supervisor did not know, nor did the people whom the supervisor asked at that time. Plaintiff was told to go home while an answer was found. On or around 8:00 PM, the Plaintiff was required to do a drug and alcohol urine test the following day at noon.

27. On or about June 14th, 2020, Plaintiff received a call from the MRO. In the call the MRO told Plaintiff that the drug results showed a high concentration of marijuana metabolites, and he had to report it to the company.

28. During the days between June 14th and the day of Plaintiff's firing, there was no communication between Plaintiff and the SGRE's Human Resources Department. Notably, SGRE did not prevent Plaintiff from continuing to drive despite their policy, which provides thus: "**do not allow an employee subject to reasonable suspicion of post-accident testing to drive**" (emphasis in the original).

29. Knowing that in a meeting held on May 2nd, 2020, by Plaintiff, Mr. Christman and all the managers that Mr. Christman leads in the region, Mr. Christman announced that the new company drug and alcohol procedure was "settled and pending release, should be on May", Plaintiff requested Mrs. Pickett a copy of the policy. The document sent by Mrs. Pickett on June 23rd, 2020, was dated in 2019. Plaintiff never received a copy of that new policy that supposedly would be released the prior month.

30. Further proof of SGRE's intention is the fact that, when the Plaintiff lost control due to black ice in the highway in 2019, when Plaintiff had not "pissed people off" yet, Plaintiff was not required to perform any test whatsoever, despite the fact that technically speaking, that accident was Plaintiff's fault.

31. Regarding drug testing, the policy states that "All drug testing will be done in compliance with standards adopted for federal workforce testing and state or local law".

32. After his termination, Plaintiff learnt that federal drug testing requires certain protocols to be followed during drug collection. For example, it requires constrictions in the access to water when the drug test initiates; water was present and available for Plaintiff. Also, there were procedures that were not followed when one of the seals broke when the nurse was trying to separate it from the surface where it comes attached to. Due to this, Plaintiff requested SGRE's a copy of the drug test (MRO's copy) and any other medical record that SGRE had it its possession.

33. On July 17th, 2020, Plaintiff received the MRO's copy of the test. Contrary to what federal workplace testing requires, the chain of custody document received had no signature from the MRO, nor the laboratory performing the test. Not confirmation results, mandatory for a positive in a split specimen, were shown. Only two pages attached showed those results and MRO's input. In essence, the document received had no modifications made since Plaintiff signed it the day of the test, despite showing MRO's COPY at the bottom.

34. Based on the current legislation and his work procedures, the MRO should have stopped the process once he had seen that the laboratory did not sign the chain of customer form: however, no record of any action performed by the MRO in this regard was ever sent to Plaintiff.

35. On July 17, 2020, Plaintiff filed a Complaint through the OSHA.gov webpage under the 11c statute against his employer alleging retaliation against him after Plaintiff found health and safety issues and obscure accounting practices. After submitting it, OSHA's webpage system did not provide any feedback: therefore, Plaintiff called OSHA to confirm its reception. The reception was confirmed by the OSHA's officer who responded. Plaintiff has the log from Plaintiff's phone provider to prove that this call was made.

36. By August 14, 2020, Plaintiff had not received any communication from OSHA. Plaintiff therefore called the Pittsburgh office to seek for an update of the case. This time,

Plaintiff was informed that his Complaint was not in the system; and also, that no call was made by me that day, despite that my phone provider's phone logs prove otherwise. Accordingly, Plaintiff had to submit the Complaint again.

37. On or about September 19, 2020, Groman tried interviewing Plaintiff. However, the interview could not proceed since Groman claimed that he could not understand Plaintiff. Consequently, Groman asked Plaintiff to record a statement, which Plaintiff sent on September 20th, 2020. In this statement, Plaintiff mentioned the lost July 17th complaint.

38. Consequently, Groman and Plaintiff had interviews consecutively on September 23, 24 and 25. In the said interview, Groman was dismissive of Plaintiff's allegations. He cut Plaintiff short as he was explaining his case. For instance, when Plaintiff was trying to give Mr. Groman some background in one of the issues, necessary to understand what the problem was, Mr. Groman stated that he did not want to hear anything "that happened on another country or dates more than two years". It is worth noting that Plaintiff needed to provide a background to his allegations, so that he would be able to establish his case.

39. In addition, Mr. Groman did not want to hear anything on the health and safety issues, alleging that they were not presented within the allowed 30 days after termination, ignoring Plaintiff's first complaint on July 17th.

40. On the interview of September 24th, Plaintiff grew impatient when Mr. Groman did not want to cover health and safety issues. When recriminated by the Plaintiff (there were, still are, people at risk, and Plaintiff was worried for his former peers' safety), Mr. Groman hanged up the phone. Plaintiff sent him a text asking why, since Plaintiff had been straight, but polite, all the time; he also asked Mr. Groman if he would be called again or not. Mr. Groman responded that he would call Plaintiff the following day.

41. Before hanging up the phone that day, Plaintiff had told Mr. Groman that, if what it was needed for Mr. Groman to focus in the more urgent health and safety issues, was

for Plaintiff to withdraw the fraud claims, Plaintiff would do so gladly. Mr. Groman told Plaintiff that, if that was the case, Plaintiff could send him a letter of withdrawal, and he said that in that case, Plaintiff and him could retake the H&S claims. At that time, Plaintiff did not know that Mr. Groman had no authority to do that and doing so is a violation of the code.

42. On September 25th, 2020, after acknowledging receipt of the fraud withdrawal, Mr. Groman announced Plaintiff that his claim will be rejected for not being presented on time. He also told Plaintiff that he will receive a letter from the Secretary of Labor with the decision, and after received, Plaintiff could appeal the decision.

43. Although the rejection letter was sent with proof of delivery confirmation, the UPS driver dropped it between a door and its storm door that Plaintiff never uses, as he had furniture at the other side blocking its use. This letter, dated January 28th, 2021, four months after the last interview between Plaintiff and Mr. Groman, was not found by Plaintiff until spring, when he decided to paint the room which that door permit access, and wanted ventilation. Consequently, due to the UPS driver not following the instructions, and Mr. Groman not checking that the communication was effectively received, Plaintiff lost the period to present an appeal.

44. Plaintiff's next recourse was to file a FOIA request on two grounds namely: that Plaintiff needed more information from his case, to pursue legal action; and the letters must be sent with proof of delivery confirmation, pursuant to the Whistleblower manual.

45. Plaintiff found out that:

   i. Groman had searched, and instructed everyone to search, for Plaintiff's initial complaint dated July 14, instead of July 17, when the Complaint was made, <u>the whole basis of Plaintiff claim's rejection</u>.

   ii. Groman failed to mention the broken chain of custody. He only reported that "He was terminated for failing a drug test", despite knowing about the

        company's violation, omitting critical information which omission could cause harm in Plaintiff's any intent of pursuing future legal actions.

   iii.   Mr. Groman performed recorded interviews in four occasions: one on September 23rd, one on September 24th, and two on September 25$^{th.}$ However, he failed to provide the September 23rd and 24th recordings; precisely those that could show Mr. Groman's general hostile environment projected towards Plaintiff, and the violations of the Whistleblower Inspector codes and regulations he committed, such as the one mentioned about 18 U.S. Code § 1514A (e) (1): Waiver of rights and remedies.

   iv.   While the document was sent with proof of delivery confirmation, the 'UPS' driver wrote "left in the front door". No one checked if the signature was effectively provided, which it did not. The courier tracking emails were never sent to Plaintiff either. Therefore, Plaintiff could not know if/ when it was sent or not.

   v.   Since Groman did not take any notes and just rejected the claim, no investigation was made on the health and safety or fraud incidents.

46. On or about July 7, 2021, Plaintiff again called OSHA to see whether the initial complaint can be retrieved. Coincidentally, Groman picked the phone and immediately recognized Plaintiff. Groman informed Plaintiff that his Section 11(c) could not be investigated because they were rejected.

47. Plaintiff raised concerns why his claims were rejected, and calmly explain Mr. Groman all the violations of the Whistleblower Manual he had made in Plaintiff's case. Mr. Groman seemed apologetic, but his behavior changed when Plaintiff asked Mr. Groman what him and/ or OSHA had done in a year to investigate those serious H&S allegations. At this

point, Mr. Groman became uncomfortable, and asked to end the conversation, giving Plaintiff Mr. Rudzki, Mr. Groman's boss, phone number, if Plaintiff wanted any more answers.

48. Plaintiff then called Mr. Rudzki, who ended siding with Mr. Groman. Since Plaintiff's intent was to resolve this in the easiest way for both OSHA and Plaintiff, but OSHA did not want, or could not, reverse the decision, or simply communicate the Secretary of Labor the mistake, so he could right the wrong, Plaintiff told Mr. Rudzki that OSHA was giving Plaintiff no option than to initiate a FTCA claim.

49. Despite of what Plaintiff was told the day before, the following day, Brian, allegedly Groman's co-worker, called Plaintiff requesting further information on the H&S issues, since OSHA wanted to investigate them now. Plaintiff told the OSHA's office that, while he was aware that collaborating now did not affect his personal case, he would still help OSHA on the investigation. Plaintiff believes that this change of heart from OSHA was due to the threat of Federal Courts mentioned to Mr. Rudzki, with the aim of calm Plaintiff down and dissuade him from take any further actions.

50. On July 16th, 2021, Plaintiff sent a letter to Mr. Christopher M. Robinson, OSHA's Area Director for the Pittsburgh office, clarifying that, contrary to what it looks, he did not present any claim in July, 2021, but in July 2020; and this new "complaint" was made by OSHA under Plaintiff's name without his permission. Plaintiff also stated that despite this, he will still collaborate with OSHA in any investigation it decides to perform. In the letter, Plaintiff also told Mr. Robinson the story of the matter as it is explained now before this Court.

51. This time, OSHA sent a letter to SGRE stating my allegations. However, the redaction of the letter was deficient at best, and did not explain the issues properly. It is worth noting that the letter was based only on what Plaintiff told Brian, the OSHA officer, on July 8th; an interview happened unexpectedly for the Plaintiff, and for which the officer was obviously not technically prepared to understand.

52.   On July 21st, 2021, OSHA sent Plaintiff's two documents. One, titled "Employer Response and Documents – Siemens Gamesa" was SGRE's counsel response to the allegations sent to them. The second document, titled "Source - Satisfactory Response Closing Letter – Siemens Gamesa", written by Mr. Robinson, was OSHA determination to close my claims, violating Plaintiff's Due Process rights, that allow Plaintiff to submit a counter response to the employer letter **before** OSHA could close the case.

53.   Plaintiff responded with a 200-page document specifying all safety violations of his employer and giving extensive documentary proof. Despite the Closing Letter sent, the document was accepted by OSHA. The last thing that Plaintiff was told is that the document was sent to their experts to be evaluated. Plaintiff was told about this during the first week of August and again in a latter received on September 28th, 2020, which will be referred in a later paragraph..

54.   Consequently, Plaintiff called other entities, including the OSHA Pittsburgh's office, the WPP office in Philadelphia and Washington, and the Solicitor's office. Plaintiff was only advised to submit his case to the office of the Secretary of Labor, supposedly the only one with authority to reverse the decision.

55.   On September 15th, 2021, as a last resource before going to Court, Plaintiff sent an email to the Secretary of Labor at his email address, TalkToMarty.gov, and explained his case. Two weeks later, on September 28th, Plaintiff received an email from the OSHA Philadelphia Region 3 sited in Philadelphia, PA, with the response from Michael J. Rivera, OSHA's Regional Administrator. In it, Mr. Rivera alleges that, after reviewing my case again, he determined that OSHA complied with all policies and procedure and closed the case once more.

56.   To clarify, this email from Mr. Rivera was the response to my email to the Secretary of Labor, as Mr. Rivera explained during the letter.

57. As soon as the letter was received, Plaintiff called Mr. Celmouth Steward, who was listed in the letter as the contact point. Plaintiff explained that this new rejection letter, again, did not mention the mistaken days or Mr. Groman's failure to provide all the recordings in the FOIA's request, among all the other irregularities subject of this Complaint.. Mr. Stewart told Plaintiff that he will be investigating that and would get back to Plaintiff with whatever he would find.

58. As of October 7th, 2021. Mr. Steward has not called Plaintiff back. Plaintiff has called and left several voicemails but has not received answers from Mr. Steward in one direction or another. On October 6th, an OSHA officer called in response to one of the voicemails and told Plaintiff that since he had spoken with Mr. Steward, the issue was above the officer's jurisdiction and control, as Mr. Robinson was above him in the chain of command. He promised Plaintiff to communicate that to Mr. Robinson, who has not contacted Plaintiff at the time this Complaint is presented.

## CLAIMS FOR RELIEF

### COUNT 1

### WILLFUL MISCONDUCT

**(Against Defendants Steven Groman and Jack Rudzki)**

59. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as though said paragraphs were fully set forth herein.

60. The said Defendants had a Statutory duty to ensure Plaintiff gets justice for his retaliation claims. Rudzki also had a duty to conduct proper supervision and review of Groman's work.

61. Defendants were aware that breach of the said duties would subject Plaintiff to harm and/or loss yet did not do anything to correct the mistake initially made.

62. Groman also failed to provide a report of concise facts of what exactly happened. He only stated: "He was terminated for failing a drug test", leaving out pertinent information on Plaintiff's case.

63. Groman conducted the interview unprofessionally. He kept interrupting Plaintiff and focused on the fraud claims alone, violating his own code in regards of treatment to the complainant and the establishment of a safe environment where Plaintiff could have exposed his concerns without coercion.

64. Groman willfully failed to appreciate Plaintiff's Section 11(c) allegations. He knew he had no specialization in Section 11(c) matters, yet proceeded to reject Plaintiff's claims. Besides, he negligently referred several times to his previous duty as a State Trooper to the reasonable concern to the Plaintiff, who had been subjected to a drug test and had been charged with drug consumption.

65. Groman also illegally proposed to Plaintiff that he withdraws his fraud claims and be left with the Section 11(c) claims, in direct violation of 18 U.S. Code § 1514A (e) (1)

66. Groman failed to provide all the recordings requested using the FOIA process, hiding the ones who could show his behavior towards Plaintiff the first two days of interviews.

67. Rudzki assigned Plaintiff's case without considering the nature of Plaintiff's claims, and the expertise of Groman. Besides, Rudzki failed to conduct a proper follow up on the erroneous statement of the date of Plaintiff's initial Complaint. Rudzki also failed to properly supervise Groman to ensure Groman conducted a proper investigation of Plaintiff's claims. Lastly, he failed to correct the mistake once it was discovered, willingly dismissing any effort made by Plaintiff to resolve the issue before using the Court option and avoid unnecessary pains and costs.

68. As a result of Defendants' actions and/or inactions as alleged herein, Plaintiff was denied access to Justice when his Complaint was rejected.

## COUNT 2

## VIOLATION OF PLAINTIFF'S 14TH AMENDMENT DUE PROCESS RIGHTS

### (Against Defendants Steven Groman and Jack Rudzki )

69. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as though said paragraphs were fully set forth herein.

70. Due process requires that a person (1) receive notice of the nature of the proceeding (2) and a meaningful opportunity to be heard (3) before an impartial fact-finder (4) and with a written statement of findings.

71. The opportunity to be heard must be at a meaningful time and in a meaningful manner.

72. Groman violated Plaintiff's due process rights when he failed to give Plaintiff time to explain his allegations. Notably, Groman cut Plaintiff short, and expressly barred Plaintiff from giving a background to his claims.

73. Groman also violated Plaintiff's due process rights when, ignoring Plaintiff's statement of September 20th, 2020, he misstated the date for Plaintiff's initial Complaint, which misstatement caused Plaintiff's case to be delayed, and to be rejected ultimately.

74. Rudzki failed to properly supervise Groman to ensure he performed his services in a professional manner.

75. As a result of Defendants' actions and/or inactions as alleged herein, Plaintiff's due process rights were violated. Also, Plaintiff's Complaint was rejected.

## COUNT 3

## NEGLIGENCE

### (Against Defendants Steven Groman and Jack Rudzki)

76. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as though said paragraphs were fully set forth herein.

77. The said Defendants had a Statutory duty to ensure Plaintiff gets justice for his retaliation claims. Rudzki also had a duty to conduct proper supervision and review of Groman's work.

78. Groman breached the said duty by misstating the date for Plaintiff's initial Complaint; by failing to give Plaintiff ample time to explain his claims; by rejecting Plaintiff's claims without giving Plaintiff proper and fair hearing.

79. Rudzki also breached the said duty by failing to conduct proper supervision and review of Groman's work.

80. OSHA also violated Plaintiff's Due Process rights when they closed again the claim on July 21st, 2021, without giving Plaintiff an opportunity to submit a response to SGRE's counsel response. Only Plaintiff's insistence and dedication to resolve these H&S issues was what had made OSHA, despite OSHA's repeated closures, forced the investigation to be continued.

81. Both Mr. Groman and Mr. Rudzki were negligent on not investigating the issues presented before them by Plaintiff, and they only did so after being threatened with legal actions one year after Plaintiff's first notification to them. This has resulted in technicians still at risk due to those issues throughout the USA.

82. As a result of Defendants' actions and/or inactions as alleged herein, Plaintiff's due process rights were violated. Also, Plaintiff's Complaint was rejected.

83. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as though said paragraphs were fully set forth herein.

84. As a result of Defendants' actions and/or inactions as alleged herein, Plaintiff's due process rights were violated. Also, Plaintiff's Complaint was rejected.

## COUNT 4

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

85. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as though said paragraphs were fully set forth herein.

86. The acts and conducts of the Defendants were extreme and outrageous. The Defendants intended to cause, or were in reckless disregard of the probability that their actions and/or inactions would cause, emotional distress to Plaintiff.

87. The said actions and/or inactions did directly and proximately cause severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

88. The actions and/or inactions described in this Count were undertaken with willfulness and reckless indifference to the rights of others.

89. As a proximate result of Defendants wrongful acts and/or omissions, Plaintiff suffered damages, including emotional distress and anguish.

## COUNT 5

### VICARIOUS LIABILITY

### (Against OSHA)

90. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as though said paragraphs were fully set forth herein.

91. The said Defendant is the employer of the other two Defendants herein.

92. Accordingly, the said Defendant is liable for all the other two Defendants' allegations under the doctrine of *respondeat superior* (Vicarious Liability).

93. As a proximate result of Defendants wrongful acts and/or omissions, Plaintiff suffered damages, including emotional distress and anguish.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff is entitled to damages from the Defendants, and he hereby prays that judgment be entered in his favor and against the Defendant as follows: Complainant seeks the following remedies:

i. That the Court orders compensatory damages in an amount to be determined by the court, for the Defendants actions and/or inactions.

ii. That the Court orders compensatory damaged for the emotional distress and anguish caused by Defendants for their injurious and malicious actions against the Plaintiff.

iii. That the Court orders a fresh hearing of Plaintiff's claims against SGRE.

iv. That the Court, if Plaintiff's pray for a fresh hearing of Plaintiff's claims against SGRE is heard, grants Plaintiff the right for a Jury Trial.

v. That the Court orders reimbursed court costs, maximum pre and post judgment interest.

vi. That the Court issues any other order that this institution deems just.

Respectfully submitted:

Dated: _____

_____

ANGEL LAUZARA
114 Venango Street
Johnstown, PA 15905
**Pro se**

## CERTIFICATE OF MAILING

I, [ENTER NAME], certified on this _____ day of _____ 2021, I deposited a true copy of the above to the Defendants by placing the documents with prepaid postage in the United States mailbox address.

**[ENTER ADDRESSES OF ALL DEFENDANTS]**

_____

ANGEL LAUZARA
114 Venango Street
Johnstown, PA 15905
**Pro se**